**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IBAN J. FRIAS AQUINO,**<br>**Plaintiff,**<br><br>**v.**<br><br>**LIFEGUARD HOME CARE AGENCY, INC.,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 25-cv-4693** |

**MEMORANDUM OPINION**

Plaintiff Iban J. Frias-Aquino ("Frias-Aquino") brings, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000d *et. seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et. seq.* ("ADA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et. seq.* ("PHRA"), this pregnancy discrimination action against her former employer, Defendant Life Guard Home Care, Inc. ("Life Guard"), premised, she says, on a hostile work environment that culminated in her wrongful termination. Life Guard now moves for summary judgment under Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56. It argues that: (1) Frias-Aquino "cannot establish a prima facie case of discrimination based on pregnancy nor perceived disability and, even if she could, she cannot establish that the stated nondiscriminatory reason for [Life Guard]'s actions" is pretextual; (2) Frias-Aquino "comes nowhere close to sufficient facts to demonstrate a hostile work environment either based on pregnancy or perceived disability"; and, (3) in any event, Frias-Aquino "failed to exhaust administrative remedies" for her ADA and PHRA claims regarding perceived disability. For the reasons below, the motion shall be granted in part and denied in part.

## I. FACTUAL BACKGROUND

Frias-Aquino worked as a caregiver for a home care agency, Life Guard, which

specializes in "in-home personal care for adults." When assigned to a patient, she took care of the personal care needs of that patient with the precise nature of her care rendered differing with each patient. Some required physical lifting on the part of their caregivers, while other, more independent patients did not need such support.

Frias-Aquino was providing services to a client referred to herein as "Patient M" shortly after she learned she was going to have a baby. One week after she notified Edwin Garcia ("Garcia"), the co-owner and operations manager of Life Guard, of her pregnancy she was rushed to the emergency room "due to bleeding and was told she was pregnant with twins." She informed Garcia. There is some dispute about what happened next. Life Guard asserts that Frias-Aquino "requested accommodations due to her pregnancy," while she maintains it was Garcia who "immediately became falsely concerned with the news" and unilaterally labeled her pregnancy as "high-risk." All agree that she was reassigned from Patient M. "Patient N.S.," her new patient, "did not need any physical lifting and was more independent than Patient M." Frias-Aquino says that in the three or so weeks she worked with Patient N.S. her hours varied but she estimates that the change of patient led to a reduction in the hours she worked per week: she had worked for approximately thirty hours with Patient M which dropped to twenty-eight hours when she took over Patient N.S.'s care.

The circumstances surrounding the conclusion of Frias-Aquino's work with Patient N.S.—which also marked the end of her employment with Life Guard—are also in dispute. She maintains that her removal from Patient N.S. constituted termination because she was never reassigned to another patient. Life Guard, however, asserts that she resigned when she indicated that she did not want a replacement patient after being informed that Patient N.S. no longer wanted her as her caregiver.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted), and an issue of material fact is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248-49, 252. Motions for summary judgment are evaluated with the facts viewed in the light most favorable to the nonmoving party, and any reasonable inferences must be made in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The initial burden of demonstrating the absence of a genuine dispute of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then present affirmative evidence from which a reasonable trier of fact could return a verdict in its favor. *Anderson*, 477 U.S. at 257.

Importantly, the summary judgment "standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (citation and internal quotations omitted). Indeed, the Third Circuit has advised that "[s]ummary judgment is to be used sparingly in employment

discrimination cases." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).

## III. DISCUSSION

### A. Administrative Exhaustion of Perceived Disability Claims

As a threshold matter, Life Guard argues that Frias-Aquino's perceived disability claims under the ADA and PHRA must be dismissed for failure to exhaust administrative remedies.

"[B]oth the ADA and the PHRA require pursuit of administrative remedies before a plaintiff may file a complaint in court." *Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999). This entails "fil[ing] a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)). Merely filing an administrative claim, however, does not give a plaintiff carte blanche to pursue any claim in federal court; rather, the ensuing suit must remain within the scope of the prior administrative claim. *See Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999) ("[T]he parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination . . . ." (citation and internal quotations omitted)). Nevertheless, "the scope of the original charge should be liberally construed," *Hicks v. ABT Assocs. Inc.*, 572 F.2d 960, 965 (3d Cir. 1978), and the requirement to exhaust administrative remedies is therefore satisfied so long as it "provide[s] the Commission with sufficient information so that it may notify prospective defendants." *Rabzak v. Berks Cnty.*, 815 F.2d 17, 20 (3d Cir. 1987) (cleaned up).

The EEOC charge filed by Frias-Aquino on February 17, 2025, reads in pertinent part as follows:

> In or about November of 2024, I learned that I was pregnant with twins and notified my manager, Chery Brito (hereinafter "Brito"), of the same. Brito immediately became

> concerned with the news that I was pregnant and told me that she would have to reassign me to another patient that was "**easier**." I did not request another patient, and I was capable of performing my job with the same patient who I had already been assigned to. However, Brito insisted that I needed a patient that was **easier to handle** because of my pregnancy.

(emphasis added). Here, Frias-Aquino does not allege that she was reassigned merely because she was pregnant, but instead because of the *perception* that she would need an "easier to handle" patient by virtue of her being pregnant with twins. Although the phrase "perceived disability" is not used explicitly in Frias-Aquino's filing, the necessary implication of her alleged discrimination is that Life Guard perceived her pregnancy as a disabling condition such that accommodations—vis-à-vis an "easier" patient—were warranted.[1] "[L]iberally constru[ing]" Frias-Aquino's EEOC charge, *Hicks*, 572 F.2d at 965, sufficient notice was therefore provided regarding her alleged perceived disability discrimination so as to render her ADA and PHRA claims administratively exhausted.

**B. Wrongful Termination**

Turning now to Frias-Aquino's Title VII pregnancy and ADA perceived disability discrimination claims, which are premised on wrongful termination. Both are governed by the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802 (1973) (providing the framework for Title VII cases); *see also Shaner v. Synthes*,

---

[1] It bears mentioning that the instant facts are distinguishable from the out-of-district case relied on by Life Guard in arguing that Frias-Aquino's pregnancy is not an ADA-covered disability. *See Matthews v. New Light, Inc.*, 2022 WL 11966542, at *4 (W.D. Pa. Oct. 20, 2022) ("Therefore, the Court finds that, because Plaintiff has alleged that Defendant perceived her as being disabled because of her pregnancy—and since pregnancy is not a disability on its own under the ADA—Plaintiff has not alleged a disability under the ADA."). In *Matthews*, the plaintiff "allege[d] that Defendant regarded her as pregnant (which is not a disability under the ADA), but she d[id] not specifically allege that Defendant regarded her as having *pregnancy-related complications* (which may constitute a disability under the ADA)." *Id.* at *3 (emphasis added). Here, Frias-Aquino's allegation is precisely that Life Guard "regarded her as having pregnancy-related complications," *id.*, such that she would require reassignment to an "easier" and, impliedly, less strenuous patient. *See* Part III(B)(i)(b), *infra*. The principle espoused by *Matthews* is therefore inapposite.

204 F.3d 494, 500 (3d Cir. 2000) ("We have indicated that the burden-shifting framework of *McDonnell Douglas* . . . applies to ADA disparate treatment and retaliation claims.").[2] The *McDonnell Douglas* framework operates as follows:

> Briefly summarized, the *McDonnell Douglas* analysis proceeds in three stages. [1] First, the plaintiff must establish a prima facie case of discrimination. [2] If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment decision] . . . . [3] Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . While the burden of production may shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (citations and internal quotations omitted).

### ***i. Frias-Aquino's Prima Facie Cases***

The first question to be answered is, accordingly, whether Frias-Aquino has established a prima facie case for her pregnancy discrimination and perceived disability claims.

#### a. <u>Pregnancy Discrimination</u>

Under Title VII, employers are prohibited from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act ("PDA"), a 1978 amendment to Title VII, updated the statute's

[2] Frias-Aquino's parallel claims under the PHRA are evaluated in the same manner as her Title VII and ADA claims. *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) ("Generally, the PHRA is applied in accordance with Title VII." (citation omitted)); *Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.2d 751, 761 n.6 (3d Cir. 2004), *superseded on other grounds* ("An analysis of an ADA claim applies equally to a PHRA claim." (citation and internal quotations omitted)); *accord Gen. Elec. Corp. v. Pa. Hum. Rels. Comm'n*, 469 Pa. 292, 304-06 (1976) (adopting the holding of *McDonnell Douglas*).

prohibition of employment discrimination based on an employee's sex, *see id.*, to include discrimination on the basis of pregnancy. *See generally* 42 U.S.C. § 2000e(k) (PDA). Therefore, "[t]here is employment discrimination whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision." *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 294 (3d Cir. 1997) (citing 42 U.S.C. § 2000e–2(m)).

Only if a plaintiff establishes that she: (1) "is a member of a protected class"; (2) "is qualified for the position"; (3) she "suffered some form of 'adverse employment action' sufficient to evoke the protection of Title VII and the PHRA"; and, (4) that she suffered that action "under circumstances that give rise to an inference of unlawful discrimination," has her prima facie case of employment discrimination been met. *Jones*, 198 F.3d at 410 (citations and internal quotations omitted). "[T]he *prima facie* requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *C.A.R.S. Prot. Plus, Inc.*, 527 F.3d at 365 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Life Guard "does not dispute that [Frias-Aquino] was pregnant during her employment." Thus, Frias-Aquino is a member of a protected class. Life Guard concedes that, "generally, [Frias-Aquino] was qualified to perform the job of caretaker," but maintains that she "was not, however, qualified to perform the job duties related to Patient [M] as she was unable to lift him anymore" after becoming pregnant. While Frias-Aquino argues in her brief that she was at all times "dutiful and competent in working for [Patient M], and could have continued working for M, had it not been for Defendant's actions," that is not what she testified to at her deposition. When asked whether she "believe[d] [she] could have continued to lift that client if necessary," Frias-Aquino responded: "Not that one." This inconsistency is relevant as Frias-Aquino argues she suffered two separate adverse employment actions: her ultimate termination, as well as her

reassignment from Patient M.

To show that she was qualified, Frias-Aquino "must point to evidence from which a factfinder could reasonably infer that [she] satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) (citing *Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994)). Because Frias-Aquino does not produce any evidence to counter Life Guard's position that lifting Patient M was a required job duty—and in fact admitted that she could not continue to lift Patient M—no reasonable jury could find she was qualified for her position with Patient M. Thus, Frias-Aquino cannot succeed on the theory that her reassignment from Patient M to Patient N.S. was an unlawful discriminatory action.

Her next theory is that her termination from Life Guard was an adverse employment decision. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) ("We hold that [Plaintiff]'s termination clearly fulfills the [adverse employment action] prong of the prima facie case . . . ."). But Life Guard's position is that she was not terminated: she resigned. Life Guard points out that shortly after Frias-Aquino was assigned to Patient N.S., Cheril Brito-Perez ("Brito"), one of Life Guard's co-owners and the head of its human resources department, called her to inform her that Patient N.S. "complained that she wasn't properly being taken care of"; Brito says she then told Frias-Aquino that she "would no longer be assigned to work with Patient N.S. . . . [and] would be assigned to a new client because Patient N.S. requested another aide." Life Guard interpreted Frias-Aquino's response, "that it was fine[,] that we should leave things as they were[,] and that [she wasn't] interested on [sic] working another case," to "constitute[] resignation." But, Frias-Aquino says that she "was never told [Patient N.S.] requested another aide," and that she only "found out she was no longer working with N.S.

when attempting to clock in to Defendant's timekeeping app while at N.S.'s house and was unable to do so." She then made repeated—nine phone calls, she says—unsuccessful efforts to reach Brito in order to be assigned a new patient, in addition to an office visit where Brito "ignored [her], despite being present in the office." She only learned, she says, that Life Guard no longer considered her an employee after she "request[ed] an employment letter she could provide to welfare," which Life Guard supplied using the following language: "Employee resigned from her position on December 9th, 2024. Last day worked was December 7, 2025 [sic]." Accordingly, whether Frias-Aquino was terminated or resigned is a genuine dispute of material fact which turns on a fact finder's credibility determinations. *See Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citing *Liberty Lobby*, 477 U.S. at 255).

Finally, Life Guard argues that Frias-Aquino's departure did not occur "under circumstances that give rise to an inference of unlawful discrimination." *Jones*, 198 F.3d at 410 (citations and internal quotations omitted). Unlawful discrimination can be inferred when a plaintiff shows "the temporal proximity between the protected activity and the adverse action is 'unusually suggestive.'" *LeBoon v. Lancaster Jewish Cmty. Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). While "[t]here is no bright-line rule to determine at what point temporal proximity, in and of itself, can demonstrate an inference of discrimination . . . a span of days, and not months, satisfies the requirement." *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp.3d 663, 669-70 (E.D. Pa. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)). Importantly, in those cases "where the temporal proximity is not so close as to be 'unduly suggestive,'" then "timing plus other evidence may be an appropriate test." *Farrell*, 206 F.3d at 280. That is the case here, as the two-month lapse Frias-Aquino points to between her pregnancy

notification and subsequent termination is not so short as to be "unduly suggestive," therefore necessitating some additional evidence in order to raise an inference of discrimination. *See id.; Williams*, 380 F.2d at 760, *superseded on other grounds* (holding that evidence in addition to temporal proximity was necessary because the two-month period between plaintiff's protected activity and termination was "not so close as to be unduly suggestive").

And Frias-Aquino does indeed produce additional evidence that supports an inference of discrimination. In her deposition, she testified that she was never told that N.S. requested another aid, that no documentation exists in the record showing N.S. requested another aid, and that she only found out she was no longer working with N.S. when she was unable to clock into Life Guard's timekeeping app while at N.S.'s house. Accordingly, she argues that Life Guard's proffered explanation for her removal from Patient N.S. is fallacious and pretextual.[3]

Viewing the dispute regarding her removal from Patient N.S. in the light most favorable to Frias-Aquino, this evidence—in addition to the two-month temporal proximity—is sufficient for a jury to infer that her termination was discriminatory. Considering her light burden at this stage, *C.A.R.S. Prot. Plus, Inc.*, 527 F.3d at 365, Frias-Aquino can therefore establish her prima facie case of pregnancy discrimination.

b. Perceived Disability Discrimination

Turning now to Frias-Aquino's perceived disability discrimination claims under the ADA and PHRA. The prima facie case for perceived disability is a slightly modified version of the test used in the Title VII pregnancy discrimination context examined *supra*. To establish a prima

[3] Although Frias-Aquino cites this evidence as part of her argument that Life Guard's proffered explanation for her termination is pretextual, "nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell*, 206 F.3d at 286 (citing *Jalil v. Advel Corp.*, 873 F.2d 701, 709 n.6 (3d Cir. 1989) ("As we have observed before, the *McDonnell Douglas* formula does not compartmentalize the evidence so as to limit its use to only one phase of the case. **The plaintiff's evidence might serve both to establish a prima facie case and discredit a defendant's explanation.**" (citation and internal quotations omitted) (emphasis added))).

facie case, Frias-Aquino must show that: (1) she "is a disabled person within the meaning of the ADA," *Shaner*, 204 F.3d at 500 (citation omitted)—a requirement she may satisfy by demonstrating not that she was actually disabled, but that she was "regarded as having such [physical or mental] impairment," 42 U.S.C. § 12102(1); (2) she is "otherwise qualified to perform the essential functions of the job"; and, (3) she "has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner*, 204 F.3d at 500 (citation omitted); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 108 (3d Cir. 1996) ("Under the ADA and the EEOC regulations, a claimant may be considered disabled even if his impairment does not substantially limit a major life activity, if his impairment 'is treated by a covered entity as constituting such limitation.'" (quoting 29 C.F.R. § 1630.2(*l*)(1))). Once again, the burden upon Frias-Aquino "is not [an] onerous" one. *C.A.R.S. Prot. Plus, Inc.*, 527 F.3d at 365 (quoting *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 253).

The sole argument advanced by Life Guard to contest Frias-Aquino's prima facie case is that pregnancy cannot be used as the basis of a perceived disability claim because pregnancy is not an ADA-covered disability.[4] Life Guard is only partially correct. True, "[p]regnancy, alone, does not constitute disability." *Ahern*, 183 F. Supp.3d at 668-69 (collecting cases). However, "certain impairments that a woman experiences *as a result of pregnancy* may qualify as a disability for purposes of the [ADA]." *Brown v. Aria Health*, 2019 WL 1745653, at *4 (E.D. Pa. Apr. 17, 2019) (emphasis added) (collecting cases). Life Guard misses its mark by arguing that Frias-Aquino did not actually suffer from such complications—a claim she never makes. What Frias-Aquino does assert is that Life Guard "regarded her as 'disabled' when it falsely labeled her as a 'high-risk' pregnancy, despite the fact that she was never 'high-risk,'" and that it was

[4] Here, Life Guard again errantly relies on *Matthews*, 2022 WL 11966542. *See supra* note 1.

these concerns of a complicated pregnancy that motivated her termination. Life Guard contests this position and cites deposition testimony that it "never told [Frias-Aquino] that her pregnancy was considered high-risk." These conflicting accounts constitute a genuine dispute which, viewed most favorably to Frias-Aquino, would permit a reasonable trier of fact to find that Life Guard perceived her as disabled and terminated her accordingly. Thus, Frias-Aquino has surmounted the "low bar for establishing a *prima facie* case of employment discrimination," *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006), and has set out a prima facie case for her perceived disability discrimination claims.

### *ii. Life Guard's Proffered Nondiscriminatory Reason*[5]

Once Frias-Aquino has established a prima facie case of discrimination, the burden of production passes to Life Guard to offer a legitimate, nondiscriminatory reason for terminating her employment. *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 254. This is a "relatively light burden" that is satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Indeed, "[t]he employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (citing *Tex. Dep't of Cmty. Affs.*, 450 U.S. at 253, 254, 256).

Here, Life Guard argues that Frias-Aquino was removed from her assignment with Patient N.S. because of unsatisfactory job performance, citing Brito's deposition testimony that the patient complained about Frias-Aquino and "said to her service coordinator that [Frias-

[5] From this juncture onward, the legal standards governing Frias-Aquino's claims of pregnancy and perceived disability discrimination become coterminous and are thus analyzed in tandem.

Aquino] was not doing her job" and had some "kind of a[n] attitude with [the patient]." This explanation constitutes a legitimate, nondiscriminatory reason for Frias-Aquino's termination. *See Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014) (recognizing that "demonstrably poor job performance" qualifies as a legitimate, nondiscriminatory reason for termination).

***iii. Pretext***

Accordingly, under the *McDonnell Douglas* framework "the burden of production rebounds to [Frias-Aquino], who must now show by a preponderance of the evidence that [Life Guard]'s explanation is pretextual." *Fuentes*, 32 F.3d at 763. To meet that burden, Frias-Aquino must "point[] to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Shaner*, 204 F.3d at 501 (citing *Fuentes*, 32 F.3d at 764; *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)) (internal quotations omitted). "[T]his standard places a difficult burden on the plaintiff," putting the onus on Frias-Aquino to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Here, Life Guard argues that even if Frias-Aquino can make out her prima facie cases, summary judgment is nevertheless appropriate because she cannot show that Life Guard's proffered reason for her termination is pretextual. However, the evidence Frias-Aquino presents to cast doubt upon Life Guard's explanation—which is essentially the same evidence she put forth to establish her prima facie case of pregnancy discrimination—creates a genuine issue of material fact that precludes summary judgment. *See Fuentes*, 32 F.3d at 764 (citations omitted)

("[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case."). In particular, drawing all reasonable inferences in Frias-Aquino's favor and evaluating "the totality of the circumstances," *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022), the following disputes would warrant a reasonable trier of fact reaching the conclusion that Life Guard's claim of unsatisfactory job performance should not be believed. *See Jalil*, 873 F.2d at 707 ("Summary judgment is inappropriate, however, if the plaintiff . . . counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge."). Namely: (1) whether Patient N.S. actually complained about Frias-Aquino's services; (2) whether Patient N.S. actually requested a new caregiver; (3) if Frias-Aquino, upon being informed of Patient N.S.'s alleged complaint, was also informed that Patient N.S. had requested a new caregiver; (4) whether Life Guard properly investigated a report by Frias-Aquino that Patient N.S. had stolen goods while shopping, which complaint was lodged to Life Guard just one day before Patient N.S.'s own alleged complaint about Frias-Aquino; and, (5) the circumstances surrounding Frias-Aquino's repeated inability to reach Life Guard's managers over the phone and in-person to discuss her next patient assignment in the days following her removal from Patient N.S. Thus, Frias-Aquino's wrongful termination claims cannot be decided on summary judgment.

### C. Hostile Work Environment

Like her wrongful termination claims, Frias-Aquino's hostile work environment claims are also brought under Title VII, the ADA, and the PHRA. Each of these statutes has the same standard for hostile work environment claims. *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (regarding the PHRA and Title VII); *Colwell v. Rite*

*Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010) (regarding the PHRA and ADA). To prevail, Frias-Aquino must satisfy the following: (1) she suffered "intentional discrimination" because of her pregnancy and the perception that she was disabled because her pregnancy was high-risk; (2) "the discrimination was severe or pervasive"; (3) she was "detrimentally affected" by the discrimination; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and, (5) *respondeat superior* liability renders Life Guard responsible for the discrimination. *Mandel*, 706 F.3d at 167 (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). The gravamen of Life Guard's opposition to these claims is that Frias-Aquino fails at the second element, *i.e.*, she "does not present sufficient evidence to demonstrate an environment filled with either severe or pervasive harassment based on pregnancy or perceived disability."

"'[S]everity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017) (citing *Jensen*, 435 F.3d at 449 n.3). The conduct is evaluated by "looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 410 U.S. 17, 23 (1993)). The standard for hostile work environment claims is "demanding." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

Here, Frias-Aquino articulates four acts by Life Guard which she asserts created a hostile work environment. Assuming arguendo that the factual disputes underlying these four incidents are resolved in Frias-Aquino's favor, they would, nevertheless, neither independently nor in the

aggregate rise to the "demanding" standard Frias-Aquino must satisfy here. *See id.* The first two revolve around Life Guard's negative assessment of Frias-Aquino's work with Patient N.S. Namely, she says that Life Guard: (1) assumed that she "treated [Patient] N.S. poorly, despite [Frias-Aquino] having a perfect track record with Life Guard"; and, (2) wrongfully alleged that Frias-Aquino "made gestures" while working with the patient to indicate she did not like the work. These are both the types of "[s]nubs and *unjust criticisms* of one's work [which] are not poisonous enough to create an actionable hostile work environment." *Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 502 (W.D. Pa. 1988), *aff'd*, 856 F.2d 184 (3d Cir. 1988) (emphasis added).

Next, Frias-Aquino says Life Guard "assumed that, due to [her] 'high-risk' pregnancy, she couldn't perform the same job duties" as a non-pregnant woman or non-disabled employee. She argues that this assumption manifested a hostile work environment in that it: (1) led to her reassignment to Patient N.S., which act she labels a "functional[] demot[ion]"; and, (2) spurred her termination. Regarding her reassignment, the record shows Life Guard's assumption was in fact valid insofar as Frias-Aquino was incapable of performing certain essential caretaker responsibilities, *i.e.*, lifting Patient M. And moreover, that this same assumption may well have motivated Frias-Aquino's removal from Patient N.S. speaks only to her *termination* being discriminatory; without additional evidence, the only requisite, detrimental effect that it shows Frias-Aquino experienced in the workplace was that she was wrongfully terminated from it—an "adverse employment action that cannot itself create a hostile work environment." *Purnell v. City of Phila.*, 2021 WL 3617161, at *4 (E.D. Pa. Aug. 16, 2021) ("Courts in this district have repeatedly held that termination alone cannot support a claim of hostile work environment . . . ." (citing *Roberts v. Health Partners Plans, Inc.*, 2017 WL 3310691, at *5 n.4 (E.D. Pa. Aug. 3,

2017) (collecting cases))).

Finally, Frias-Aquino says that Life Guard "associated negative stigmas" with her need to take time off from work due to her pregnancy—a claim that is unsupported by the record. The only evidence Frias-Aquino cites in support of this argument is a portion of Garcia's deposition testimony where he was asked about Frias-Aquino's performance with Patient M. He responded that "she was doing her job" at the beginning of the patient relationship, but by the end "was calling to request sign-off very often," which he confirmed was "an issue . . . [f]or the client's family." A reasonable factfinder would most aptly characterize this evidence as a manager's routine assessment of a workplace concern, not stigmatization of the severity required to support hostile work environment claims. *See generally Fields v. Am. Airlines, Inc.*, 696 F. Supp.3d 66, 114-15 (E.D. Pa. 2023) (collecting cases where objectively more egregious incidents were deemed insufficiently severe to establish a hostile work environment under Third Circuit case law).

Accordingly, because Frias-Aquino cannot show that Life Guard subjected her to severe or pervasive harassment, "the Court need not address the remaining elements of [her] hostile work environment claim[s]." *Id.* at 117. Therefore, Life Guard's motion will be granted with respect to Frias-Aquino's hostile work environment claims.

An appropriate order follows.

**BY THE COURT:**

**/s/ Wendy Beetlestone**
**WENDY BEETLESTONE, C.J.**